**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| **WSOU INVESTMENTS, LLC d/b/a,** | § | |
| **BRAZOS LICENSING AND** | § | |
| **DEVELOPMENT** | § | **Civil Case No. 6:20-cv-573-ADA** |
| | § | **Civil Case No. 6:20-cv-575-ADA** |
| *Plaintiff,* | § | **Civil Case No. 6:20-cv-577-ADA** |
| v. | § | **Civil Case No. 6:20-cv-585-ADA** |
| | § | |
| **GOOGLE LLC,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant.* | § | |
| | § | |

**GOOGLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.  U.S. PATENT NO. 7,620,967 (CASE NO. 6:20-CV-573-ADA) .................................... 1

    A.  broadcast/broadcasting" (claims 1, 7)..................................................................... 1

II.  U.S. PATENT NO. 8,559,928 (CASE NO. 6:20-CV-575-ADA) .................................... 4

    A.  "contact information" (claims 1, 15, 23) ................................................................ 4

    B.  "tree structure" (claims 1, 15, 23)......................................................................... 5

III.  U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA) .................................... 9

    A.  "stationary state" (claims 1 and 11) ...................................................................... 9

    B.  "incrementing [of] a count[er] for a stationary state" (claims 1 and 11)............. 13

    C.  "determin[e/ing] a primary set of stationary states" (claims 1 and 11) .............. 14

IV.  U.S. PATENT NO. 8,751,585 (CASE NO. 6:20-CV-00577-ADA) .............................. 18

    A.  "moving the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," "to move the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," and "moving the first electronic message from the inbox of the electronic mail client associated with the user to the first storage location associated with the first archiving rule after the first action specified in the first archiving rule is detected" (claims 1, 9, 17) ...................................................................... 18

    B.  "a list of actions" and "a plurality of actions" (claims 1, 9, 17) ......................... 20

    C.  "client management processor configured to enable the user to select an electronic message from the inbox" (claim 9) .................................................... 22

    D.  "a detection processor configured to detect the action defined in the archiving rule assigned to the selected electronic message was carried out" (claim 9)............................................................................................................. 22

    E.  "a collaborative application management processor configured to manage collaborative applications" (claim 9) .................................................................. 22

## TABLE OF AUTHORITIES

Page

CASES

*Atlas IP, LLC v. Medtronic, Inc.*,
  809 F.3d 599 (Fed. Cir. 2015) ............................................................................21

*Cypress Lake Software, Inc. v. Samsung Elecs. Am. Inc.*,
  382 F. Supp.3d 586 (E.D. Tex. 2019) ..................................................................25

*Dyfan, LLC v. Target Corp.*,
  6:19-cv-179-ADA, Dkt. 57 (W.D. Tex. 2020) .....................................................23

*Egenera, Inc. v. Cisco Sys., Inc.*,
  972 F.3d 1367 (Fed. Cir. 2020) ...........................................................................24

*Infinity Comput. Prods. v. Oki Data Ams., Inc.*,
  Case No. 20-1189, Dkt. 46 (Fed. Cir. Feb. 10, 2021) ...................................11, 15

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) ...........................................................................11

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002) .............................................................................8

*Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*,
  2015 WL 4937464, at *9 (W.D. Tex. 2015) .........................................................23

*KLA-Tencor Corp. v. Xitronix Corp.*,
  Case No. 08-723, 2011 WL 318123 (W.D. Tex. Jan. 31, 2011) ...........................12

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
  800 F.3d 1366 (Fed. Cir. 2015) ...........................................................................24

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) .....................................................................14, 16

*MIT v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006) ...........................................................................25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) .............................................................................................16

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)............................................................................25

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)......................................................................1, 4, 5

*Omega Patents, LLC v. CalAmp Corp.*,
    920 F.3d 1337 (Fed. Cir. 2019)..............................................................................5

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004)............................................................................16

*Qcue, Inc. v. Digonex Techs., Inc.*,
    Case No. 12-484, 2013 WL 4784120 (W.D. Tex. Sept. 5, 2013), *aff'd*, 575 F.
    App'x 895 (Fed. Cir. 2014) ........................................................................ passim

*Rain Computing, Inc. v. Samsung Elecs. Co.*,
    2020 WL 708125 (D. Mass. Feb. 12, 2020) .........................................................24

*Rapanos v. United States*,
    547 U.S. 715 (2006) (Opinion of Scalia, J.) ..................................................15, 17

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002)..............................................................................9

*St. Isidore Research, LLC v. Comerica Inc.*,
    2016 WL 4988246 (E.D. Tex. 2016) ....................................................................23

*Versata Software, Inc. v Zoho Corp.*,
    213 F. Supp. 3d 829 (W.D. Tex. 2016)................................................................12

*Wang Labs., Inc. v. Am. Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)............................................................................13

*Welker Bearing Co. v. PHD, Inc.*,
    550 F.3d 1090 (Fed. Cir. 2008)............................................................................24

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)..............................................................22, 23, 24

**OTHER AUTHORITIES**

The IEEE Standard Dictionary of Electrical and Electronics Terms (6th Ed. 1996) .......................7

1997 Microsoft Press Computer Dictionary (3d Ed.) ........................................................................7

Dictionary of Networking (2000) ................................................................................................2

The Illustrated Dictionary of Electronics (Eighth Ed. 2001) ..........................................................2

Newton's Telecom Dictionary (16th Ed. 2000).........................................................................2, 3

Newton's Telecom Dictionary (20th Ed. 2000)..............................................................................7

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Ex. 1 | U.S. Patent No. 7,620,967 |
| Ex. 2 | *Broadcast, Narrowcasting,* and *Unicast*, Newton's Telecom Dictionary (16th Ed. 2000) |
| Ex. 3 | *Broadcast*, The Illustrated Dictionary of Electronics (Eighth Ed. 2001) |
| Ex. 4 | *Broadcast* and *Unicast*, Dictionary of Networking (2000) |
| Ex. 5 | *Broadcast* and *Narrowcast*, PCMagazine.com (last visited Jan. 13, 2021) |
| Ex. 6 | *Unicast*, Techterms.com (last visited Jan. 13, 2021) |
| Ex. 7 | U.S. Patent No. 8,559,928 |
| Ex. 8 | *Tree and Tree Structure*, Computer Dictionary (3rd Ed. 1997) |
| Ex. 9 | *Tree Structure*, Appeal Brief with Appx A from '928 file history (May 21, 2009 ) |
| Ex. 10 | *Tree Structure*, Applicant Arguments/Remarks Made in an Amendment from '928 file history (Feb. 13, 2013) |
| Ex. 11 | *Tree and Tree Structure*, The IEEE Standard Dictionary of Electrical and Electronics Terms (6th Ed. 1996) |
| Ex. 12 | *Tree*, Newton's Telecom Dictionary (20th Ed. 2000) |
| Ex. 13 | U.S. Patent No. 8,737,961 |
| Ex. 14 | Request Under After Final Consideration Pilot Program of November 12, 2013 for the '961 patent |
| Ex. 15 | Notice of Allowance of December 16, 2013 for the '961 patent |
| Ex. 16 | U.S. Patent No. 8,751,585 |

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development |
| Google | Defendant Google LLC |
| '967 patent | U.S. Patent No. 7,620,967 |
| '928 patent | U.S. Patent No. 8,559,928 |
| '961 patent | U.S. Patent No. 8,737,961 |
| '585 patent | U.S. Patent No. 8,751,585 |
| Group 3 Patents | Collectively, U.S. Patent Nos. 7,620,967; 8,559,928; 8,737,961; and 8,751,585 |
| POSITA | Person Of Ordinary Skill In The Art |

\*  *Emphasis added unless indicated otherwise.*

\*\* *For the Court's convenience, Google cites to WSOU's opening brief by referring to the brief filed in Case No. 6:20-cv-573-ADA (which is the same for all of the above-captioned cases) and to the pagination generated by CM/ECF (at the top of the page) rather than the pagination at the bottom of the page.*

## I.      U.S. PATENT NO. 7,620,967 (CASE NO. 6:20-CV-573-ADA)

The '967 patent relates to methods of broadcasting information to all users in a network by first broadcasting descriptors of the information, allowing each receiver to qualify the potential interest in the respective information, and then broadcasting the information during off-peak times.  (Ex. 1 at Abstract.)

### A.      "broadcast/broadcasting" (claims 1, 7)

| Google's Proposed Construction | WSOU's Proposed Construction |
| --- | --- |
| simultaneously transmit/transmitting to all receivers in a network | plain and ordinary meaning |

Google's proposed construction of "broadcast/broadcasting" reflects the term's established meaning as shown by how the inventors themselves used the term throughout the '967 patent and by contemporaneous dictionaries.  WSOU attacks Google's construction without stating what WSOU contends the term means.  The Federal Circuit instructs that when a term's ordinary meaning is disputed, "claim construction requires the court to determine what claim scope is appropriate in the context of the patents-in-suit."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Google's construction is appropriate and required, for several reasons.

<u>First</u>, the intrinsic evidence confirms that "broadcasting" is the simultaneous transmission to all receivers in a network.  The specification consistently uses the term "broadcast" as sending to all receivers.  (*See, e.g.*, Ex. 1 at 9:6-9 ("Step 14: The transmissions are broadcast to all receivers. The network of satellites 5 broadcasts throughout the coverage area each of the transmissions produced by the production units."), 7:29-35 ("The system represented in FIG. 1 comprises a hardware infrastructure consisting of a gateway 1, i.e. a system comprising a broadcast server 2, a transmission system 3 and an antenna 4. The infrastructure further includes a satellite or a constellation of satellites 5 adapted to distribute signals received from the sending

1

station to various receivers 7 in a given region or over the whole planet."), 2:24-26 ("Expressed differently, the method according to the invention consists of sending all information items likely to be of interest to all users to all the receivers of the network."), 11:8-22 (references to "each receiver").)

     <u>Second</u>, contemporaneous dictionary definitions of "broadcast" further support Google's construction:

- Newton's Telecom Dictionary, 16th Ed.: "to send information to two or more receiving devices simultaneously – over a data communications network, voicemail, electronic mail system, local TV/radio station or satellite system."' (Ex. 2 at 4.)

- The Illustrated Dictionary of Electronics, Eighth Ed.: "transmission or dissemination of signals to a large, unspecified number of receiving stations" (Ex. 3 at 4.)

- Dictionary of Networking: "to send a message to all users currently logged in to the network" (Ex. 4 at 6.)

- PC Magazine: "To transmit to every receiver within a geographical area"  (Ex. 5 at 1.)

     The meaning of broadcast is further understood by describing what it is not, and dictionary definitions of other types of transmissions are informative.  For example, a one-to-one data transmission is typically referred to as a "unicast."  Contemporaneous dictionaries define a unicast as:

- Newton's Telecom Dictionary, 16th Ed.: "The "communication from one device to another device over a network. In other words, a point-to-point communication" (Ex. 2 at 6.)

- Techterms.com: "A real-time data transmission from a single sender to one recipient." (Ex. 6 at 1.)

     Similarly, contemporaneous dictionaries define a "narrowcast" as a transmission to only a subset of the receivers in an area:

- PC Magazine: "To transmit to selected individuals" (Ex. 5 at 4.)

- Newton's Telecom Dictionary, 16th Ed.: "First there was broadcasting.  One signal went to many people.  Radio and TV are the classic concepts of broadcasting.  One signal – the same signal – to many people.  Then came the idea of narrowcasting.  One signal to a select number of people – maybe only those people who subscribed to the service and had the equipment to receive it." (Ex. 2 at 5.)

These terms, and other terminology used to refer to transmissions, have different meanings than "broadcast" and the construction of "broadcast" should not be so expansive as to cover these different approaches.

WSOU proposes that "broadcast" should be afforded its plain and ordinary meaning, but fails to explain what that meaning is.  WSOU's attacks on Google's proposed construction are meritless.  <u>First</u>, WSOU argues that Google's proposed construction improperly seeks to limit broadcasting to "an information item," which it contends excludes the "descriptor" broadcast in the claims.  (Dkt. 33 at 8.)  Google did not intend to exclude the descriptor from its construction, and to remove any confusion as to the meaning of "an information item," Google hereby revises its proposed construction of "broadcast/broadcasting" from "simultaneously transmitting an information item to all receivers in a network" to "simultaneously transmit/transmitting to all receivers in a network."

<u>Second</u>, WSOU argues that Google's proposed construction is "confusing and unclear for requiring 'simultaneously' transmitting because "transmissions in a network are not instantaneous."  (Dkt. 33 at 8.)  WSOU's argument is unsupported by the '967 patent and divorced from Google's proposal.  A simultaneous transmission does not require simultaneous receipt, or instantaneous completion of the transfer of data.  Rather, Google's construction reflects that the data being broadcast is *sent* to all receivers at the same time.

WSOU's refusal to describe its meaning suggests its intent to improperly broaden the meaning of "broadcast" to encompass different types of transmissions, such as unicasts and

3

narrowcasts.  The Court should adopt Google's proposed construction to avoid confusion, improper expansion of the scope of the claims, and further disputes.

## II.      U.S. PATENT NO. 8,559,928 (CASE NO. 6:20-CV-575-ADA)

The '928 patent is directed to a mobile communication apparatus with memory for storing contact information in a particular data structure—namely a tree structure with multiple logical levels—and methods of storing and accessing that information.  (Ex. 7 at Abstract.)  As evidenced by Google's proposed constructions, which are intended to reflect established meanings, the concepts and terms used in this patent were well-known.  But Google seeks construction of the following terms because, as WSOU's brief demonstrates, it is apparent that despite their known meanings, the parties do not agree on their scope.  Google respectfully submits that the Court is obligated to construe these terms now to resolve those disputes.  *O2 Micro*, 521 F.3d at 1362.

### A.      "contact information" (claims 1, 15, 23)

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| information related to the identity of and communication with an entity | plain and ordinary meaning |

Google's proposed construction is consistent with the plain and ordinary meaning of "contact information."  The specification supports Google's construction, consistently referring to information related to the identity of and communication with an entity, such as telephone numbers, addresses, and e-mail addresses, as "contact information."  (Ex. 7 at 4:63-67, 3:62-65, 4:27-29, Figs. 3-4.)  WSOU claims that Google's proposed construction is "confusing and unhelpful," but fails to explain how it differs from WSOU's interpretation of the plain and ordinary meaning of "contact information."  (Dkt. 33 at 8.)  WSOU also claims without explanation that Google is "improperly importing limitations not required in the claims," yet at

the same time implies that Google's construction is too broad, because "at most, all that is required is a name and one or more telephone numbers." (*Id.*)  WSOU's argument makes no sense because names and telephone numbers fall squarely within Google's construction.

What WSOU is really seeking is no construction at all to avoid having to take a position as to the boundaries of plain and ordinary meaning to allow it to later argue to the jury that information not relevant to "contact" an entity can somehow be contact information.  This is evident from WSOU's complaint and infringement contentions, which attempt to equate "settings" applied to users, such as permissions or policies governing access to particular applications or programs, with "contact information."  (Dkt. 1, ¶¶ 53-54.)  The Court should resolve this dispute and adopt Google's construction, which sets forth the proper scope of "contact information."  *See O2 Micro,* 521 F.3d at 1362*; Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1346 (Fed. Cir. 2019) ("As we have held repeatedly, '[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.'").

**B.    "tree structure" (claims 1, 15, 23)**

| Google's Proposed Construction[1] | WSOU's Proposed Construction |
|---|---|
| a non-linear data structure consisting of an ordered set of linked nodes in a connected graph with a unique root node which is not a descendent of any other node, and in which each non-root node has at most one parent node, zero or more children nodes, and a unique hierarchy value | plain and ordinary meaning |

---

[1] WSOU claims that Google's construction is "vague and unhelpful."  (Dkt. 33 at 9.) Google disagrees, but has made minor revisions to its construction to track the terminology used in the established definitions of "tree structure" in an attempt to address WSOU's concerns.

A "tree" was a well-known data structure with defined properties used long before the priority date of the '928 patent.  (Ex. 8 at 6.)  Indeed, the applicant conceded that this term was "well understood" and adopted a dictionary definition setting forth the properties of a "tree structure" during prosecution.  (Ex. 9 at 6.)  Google's construction reflects the established meaning of this term adopted by the applicant as confirmed by contemporaneous dictionary definitions.

The claims require storing "contact information" (data) using a particular structure: "a tree structure comprising a plurality of logical levels."  (Ex. 7 at 6:26-27, 6:66, 7:32-40, 8:28-29.)  Thus, the claimed "tree structure" is a data structure with specific properties.  (Ex. 10 at 8 ("A tree structure is a data structure of the memory of the mobile communication apparatus…").)  The applicant further defined the scope of those properties to overcome prior art cited during prosecution. For example, the applicant stated that a "tree structure" must be "hierarchical" in nature.  (Ex. 9 at 6.)  The applicant then represented that it "should be well understood that a 'tree structure' is a way of representing the 'hierarchical' nature of a 'structure' in a graphical form … [and] will typically be shown as a graph in the shape of a tree."  (*Id*.)  The applicant continued to distinguish prior art that simply listed a number of "menu items" that displayed certain information when selected as not meeting the claimed "tree structure," because it lacked the specific properties of being "***ordered*** with '***roots***' or '***nodes***.'"  (*Id*.)  The applicant also relied on a definition from Wikipedia (dated Feb. 6, 2008), which defined "tree structure" as "a way of representing the hierarchical nature of a structure in a graphical form," and went on to describe the properties of that structure, including the relationships between the elements or "***nodes***," including "***root***" nodes, "***parent***" nodes, and "***child***" nodes.  (Ex. 9 at 19-22.)  It further defined a "tree structure" as "acyclic"—i.e., "***there is one and only one path from any point to any other***

*point*." (*Id.*) Google's construction specifies the properties that define the claimed "tree structure"—an ordered set of linked nodes consisting of a unique root node and non-root nodes, each non-root node with at most one parent, zero or more children, and a unique hierarchy value (*i.e.*, a member of only one level of the hierarchy). The applicant adopted these properties during prosecution, and other contemporaneous technical dictionaries confirm they are part of the established definition of this term:

- 1996 IEEE Dictionary defining "tree" in the context of software as: "an abstract *hierarchical* structure consisting of nodes connected by branches, *in which each branch connects one node to a directly subsidiary node; there is a unique node called the root which is not subsidiary to any other node; and every node besides the root is directly subsidiary to exactly one other node*" and in the context of data management as: "a *nonlinear data structure* consisting of a finite set of nodes in which one node is called the root node and the remaining nodes are partitioned into disjoint sets, called subtrees, each of which is itself a tree." (Ex. 11 at 4.)

- 1997 Microsoft Press Computer Dictionary (3d Ed.) defining "tree" as "a data structure containing zero or more nodes that are *linked together in an hierarchical fashion*. If there are any nodes, *one node is the root; each node except the root is the child of one and only one node; and each node has zero or more nodes as children*." (Ex. 8 at 6.)

- 2004 Newton's Telecom Dictionary (20th Ed.) defining "tree" as "a network topology shaped like a branching tree…*It is characterized by the existence of only one route between any two network nodes*." (Ex. 12 at 4 .)

WSOU's attacks on Google's construction reveal a fundamental dispute regarding the scope of this term that must be resolved. <u>First</u>, WSOU criticizes Google for importing limitations, including "ordered" "nodes," "parent" nodes, and "child" nodes, erroneously contending there is no support for such requirements in the specification. (Dkt. 33 at 9.) As explained above, those terms come from established definitions of the properties of a "tree" data structure, including the one adopted by the applicant during prosecution. WSOU ignores the applicant's admission that those properties were part of the "well understood" scope of "tree structure," and reliance on them to overcome prior art with "menu items [that] are *not* ordered

with 'roots' or 'nodes.'" (Ex. 9 at 6.) *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1359 (Fed. Cir. 2002) (adopting "the definition espoused by the applicant during prosecution").

Second, WSOU now contends that Google's construction—and the established meaning adopted by the applicant during prosecution—should be rejected because "it expressly excludes at least a preferred embodiment." (Dkt. 33 at 10.) WSOU's complaint is focused on one property of a "tree" data structure—that it is acyclic, with each node having "at most one parent node." This property was expressly included in the definition adopted by the applicant, and confirmed by other contemporaneous dictionaries. (*See* Exs. 8, 11, 12.) WSOU points to Figure 2, which existed in the same form at the time the applicant adopted the Wikipedia definition, as an example the patent describes as "arranged in a tree structure." (Ex. 7 at 3:48-49.) This figure depicts all of the properties in Google's proposed construction except one. Specifically, it depicts an ordered set of linked nodes, with a unique root node which is not subsidiary to any other nodes, and in which each non-root node has a unique hierarchy value—but it depicts one non-root node that is connected to *two* different nodes on the level directly above it. (Dkt. 33 at 9.) Figure 2 is thus not acyclic because it includes a node that has *two* parents. But as described above, the acyclic nature of a "tree structure" was not only well-known, but WSOU adopted that property during prosecution. (*See* Exs. 8-12.) WSOU is not advocating for the term's plain and ordinary meaning, which would exclude Figure 2, but rather seeking a construction that provides for a data structure that allows non-root nodes in the "tree structure" to have multiple parents. WSOU, however, fails to articulate any such construction, nor provide any support for deviating from the admitted plain and ordinary meaning outside of Figure 2.

The applicant's admission that the "well understood" scope of "tree structure" included the property that such a structure must be acyclic warrants adoption of Google's construction. Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations because the public has a right to rely on such definitive statements made during prosecution." *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) (explaining that even though the specification described TSP as one of the preferred embodiments, the prosecution history required construing the issued claims as excluding TSP). Should the Court determine, however, that the scope should encompass Figure 2, Google submits the following alternative construction: "a non-linear data structure consisting of an ordered set of linked nodes in a connected graph, with a unique root node which is not a descendent of any other node, and in which each non-root node is allowed to have multiple parents, has zero or more children nodes, and has a unique hierarchy value."

## III.   U.S. PATENT NO. 8,737,961 (CASE NO. 6:20-CV-585-ADA)

The '961 patent generally describes deriving a context for a mobile device user such as "'work' or 'lunch' or 'recreation,'" "at or near a usual spot (such as cafe, gym, work or home)," "currently at work but is about to leave for lunch," in order to deliver a service, "such as a marketing service that provides restaurant coupons to a user going to lunch in the vicinity of a subscribing restaurant." (Ex. 13 at 1:23-26, 7:63, 7:65-67.) The specification describes "incrementally learn[ing] the location states by constantly monitoring the signal environment of the mobile device." (*Id.* at 4:28-30; *see also id.* at 22:1; 24:30-31; 29:47-49; 29:52-57.)

### A.   "stationary state" (claims 1 and 11)

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| indefinite | plain and ordinary meaning |

9

There is no dispute that the words "stationary" and "state" have plain and ordinary meanings.  But the term "stationary state" in the '961 patent does not.  The '961 patent explains that a "stationary state" is not merely the state of being stationary, but is a "semantic concept" representing more than mere location, such as "at or near a usual spot (such as cafe, gym, work or home)."  (Ex. 13 at 1:23-24, 20:28-31; *see also id.* at 24:51-52 ("To the user, these access point IDs can be easily associated with some semantic meaning.").)  The patent teaches away from reliance on known geo-location systems, and confirms that a "stationary state" must be "learned" or "derived" or "discovered" or "mined", based on the user's ongoing behavior and not merely her current coordinates.  (*Id.* at 8:1-49.)

WSOU claims that "stationary state" means "when the mobile device is determined to be not moving outside a specified area based on signal data" (Dkt. 33 at 10 (quoting Ex. 13 at 2:37-40)), but the patent disagrees.  Describing the "semantic concept of stationary states," the patent provides multiple competing definitions, leaving unanswered what scope of "stationary states" it claims:  is a mobile device in a "stationary state" the instant it crosses into an unspecified "specified area," or only if it stays within that "specified area" for some duration of time to be deemed "not moving?"  Is a mobile device in a "stationary state" as long as it stays within a "specified area," no matter how large that area and how much the device moves, or must the device be stationary—or, as the patent suggests, stationary-*ish*—to be "not moving?"

The answers to these questions would dramatically alter the scope of the claim.  Big Bend National Park, the City of Waco, and the United States of America could all be "specified areas." A person of skill in the art is entitled to know whether a user is in "stationary state" as soon as she sets foot within the "specified area" of Waco, even if she immediately turns around.  A person of skill in the art is likewise entitled to know whether a user is in a "stationary state" for

10

an entire ten-mile hike in Big Bend, or a drive across the United States—while both seem illogical, both are plausibly within the "plain and ordinary meaning" of "stationary state" WSOU proposes.  The patent thus "does not provide a reasonably clear and exclusive definition" of a "stationary state."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373 (Fed. Cir. 2014); *see also Infinity Comput. Prods. v. Oki Data Ams., Inc.*, Case No. 20-1189, Dkt. 46 at 17 (Fed. Cir. Feb. 10, 2021).

The specification also teaches, as WSOU agrees, that "[w]hen a mobile terminal is **frequently** not moving with similar sets of transmitter IDs, those similar sets define a stationary state, e.g., a limited area where the user of the mobile terminal has a **tendency to stay**" (Dkt. 33 at 10 (quoting Ex. 13 at 7:26-29)), and that "stationary states 'represent the places that a **user stays**.'"  (Dkt. 33 at 10 (citing Ex. 13 at 20:29-30).)  But the patent does not explain how long a user must stay in a limited area, or how frequently, for the stay to meet the definition of a "stationary state."  And WSOU does not say whether it believes *any* duration or frequency is required under its "plain and ordinary meaning."

The specification implies that some degree of non-movement is required for a mobile device to be in "stationary state," but, critically, it doesn't say how much.  In WSOU's example, "the specification discloses that '[w]hen mobile terminal 150 is not moving *substantively*, e.g., not moving outside a limited or otherwise specified area, the [wireless transmitter] identifiers indicated by successive signal data fields 203 are similar (changing slightly, for example, if one or more WiFi access points powers up or powers down or the user moves to different locations within an apartment).'"  (Dkt. 33 at 10 (quoting Ex. 13 at 7:17-22) (alteration in original).)  But "not moving substantively" is a purely subjective measurement, and the patent nowhere defines it, instead adding ambiguity through additional subjective criteria such as "similar" data fields, or

11

changing "slightly."  This passage likewise confirms that "not moving outside a limited or otherwise specified area" is merely an *example* ("e.g.") of "not moving substantively," which WSOU admits is part of "a stationary state."  The patent thus "fails to notify[ ] the public of the [scope of the] patentee's right to exclude" and is indefinite.  *Qcue, Inc. v. Digonex Techs., Inc.*, Case No. 12-484, 2013 WL 4784120, at \*9 (W.D. Tex. Sept. 5, 2013) (alteration in original), *aff'd*, 575 F. App'x 895 (Fed. Cir. 2014).

WSOU's attempt to save the claims thus makes the situation worse, as it offers *conflicting* examples of what it asserts is the term's "plain and ordinary meaning," each including different and ambiguous criteria:  must a mobile device be "not moving" at all, just not moving "outside a specified area," "not moving substantively," not moving "frequently," nor moving for the duration of a "stay?"  The boundaries of the term "stationary state" in the '961 patent "are essentially whatever [the plaintiff] can convince a jury to find constitutes" a stationary state.  *Qcue*, 2013 WL 4784120, at \*9.  As this Court has explained:

> [I]n interpreting Section 112's indefiniteness requirement, the Federal Circuit stated, "[t]he scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.  Some objective standard must be provided in order to allow the public to determine the scope of the claimed invention."  The court reasoned that "[r]eference to undefined [subjective] standards, regardless of whose views might influence the formation of those standards, fails to provide any direction to one skilled in the art attempting to determine the scope of the claimed invention."

*Versata Software, Inc. v Zoho Corp.*, 213 F. Supp. 3d 829, 835 (W.D. Tex. 2016) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1352 (Fed. Cir. 2005)) (alterations in original); *see also KLA-Tencor Corp. v. Xitronix Corp.*, Case No. 08-723, 2011 WL 318123, at \*4 (W.D. Tex. Jan. 31, 2011).  This term is indefinite.[2]

---

[2] WSOU briefly claims it is "odd that Defendant contends that this term is indefinite but proposes a definition which includes the term 'stationary state' in the next disputed term."  (Dkt. 33 at 10.)  Nothing could be less odd:  precisely because Google is unable to define "stationary

### B.    "incrementing [of] a count[er] for a stationary state" (claims 1 and 11)

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| incrementing a count representing time at a stationary state | plain and ordinary meaning |

The parties dispute whether the "incrementing [of] a count[er] for a stationary state" should represent time at a stationary state—assuming that "a stationary state" is not indefinite, *see supra*—or can include any counting whatsoever.  WSOU complains that Google's construction is "unnecessary and confusing," but makes no attempt to explain what it believes the "plain and ordinary meaning" of this term to be, or what "requirements" the claim language purportedly dictates.  (Dkt. 33 at 11.)

The patent describes two (and only two) counters for a stationary state, both representing time; Google's construction correctly represents these counters.  First, "the location context client 103 continuously samples the signal fingerprints from a user's mobile terminal 101," using a "fixed sampling time interval (e.g., 30 seconds)."  (Ex. 13 at 6:31-34.)  The "stationary state record 250" includes "count field 256," which "holds data that indicates the number of sample intervals for which that particular set of transmitter IDs was received simultaneously."  (*Id.* at 9:22-24.)  Second, the patent describes "a fixed transition time interval (tick)," and, after determining "the most recent stationary state z," indicates that "the duration $\gamma$ is incremented by the tick time (e.g., 10 minutes)."  (*Id.* at 7:29-30, 16:45-51.)  Google's construction thus gives meaning to the only counters for a stationary state described in the patent, which represent time. *See, e.g.*, *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("claims

---

state," it must use those words in its proposed construction of "incrementing [of] a count[er] for a stationary state."

were correctly interpreted as limited" to the "only embodiment described in the '669 patent specification").

Although WSOU's position is not entirely clear, by objecting to Google's construction it appears to contend that the plain and ordinary meaning of "incrementing [of] a count[er] for a stationary state" includes incrementing *any* counter about *anything*, such as a counter showing the number of applications open on a device.  If that is so, then WSOU's proposed construction would improperly read "for a stationary state" out of the claim.  As WSOU admits regarding the '728 patent, "interpretations that render some portion of the claim language superfluous are disfavored."  Case No. 6:20-cv-583-ADA, Dkt. 35 at 10 (quoting *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004)); *see, e.g.*, *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Qcue*, 2013 WL 4784120, at *4 ("[P]roposed construction would impermissibly read 'pricing' out of the claim.").  Should the Court find a definite meaning for "stationary state" and thus confront this issue, it should adopt Google's construction.

C.     "determin[e/ing] a primary set of stationary states" (claims 1 and 11)

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| indefinite | plain and ordinary meaning |

The patentees added this term to the asserted claims during prosecution following a final rejection for obviousness.  (Ex. 14 at 2.)  Following this amendment, the examiner allowed the claims without further comment.  (Ex. 15 at 8-9.)  But the patentees did not explain, and the patent nowhere describes, any process for determining which "stationary states" are "primary" and which are not.  The scope of the "primary set of stationary states" is bounded by the purely subjective term "primary set," and is thus indefinite.

14

The parties appear to agree that the "primary set" must be less than all the possibilities (*see* Dkt. 33 at 12), but that is where agreement ends and confusion begins.  The patent provides no guidance on what it means by "primary set" or "primary," and WSOU's attempts to fill this gap only point to equally subjective criteria.  "Primary" appears only twice in the specification:

> The user input is anything input by the user that is passed to the location context server, including any response to prompts for identifying the user's current location, to anything the user does or says at the mobile device, including applications opened and closed.  For example, in some embodiments, **when a primary stationary state is identified**, as described in more detail below, the user is prompted to label the user's current location with a word or phrase that can be used to tag the associated stationary state.  In some embodiments, the user's messages or voice calls are monitored **while the user is in one of the primary stationary states**, and the words are mined to derive a context for the stationary state.

(Ex. 13 at 8:1-13).  Although the patent promises later description in more detail, it never returns to the word "primary" or explains the bounds of the "primary set of stationary states."  Thus, the sole description of "primary" assumes that a "primary stationary state" or "one of the primary stationary states" has already been determined, without specifying or indicating how.  The patent thus fails to provide "notice to the public of 'what is still open to them.'"  *Infinity Comput. Prods.*, slip op. at 13.

Seeking to fill this gap, WSOU asserts that "the claims provide context for this claim term" because "claim 1 recites: 'determining a primary set of stationary states, each stationary state in the primary set associated with a frequently incremented count . . . .'"  (Dkt. 33 at 11-12 (quoting Ex. 13 at 37:18-22).)  But this language cannot suffice, for two reasons.  First, the claims do not state that the "primary set of stationary states" is "primary" solely because each member of the set has "a frequently incremented count"; to the contrary, they confirm that "a frequently incremented count" is necessary, but *not* sufficient, for membership in the "primary set of stationary states."  WSOU's construction would read "primary set of stationary states" out of the claim, leaving only 'determining a set of stationary states associated with a frequently

incremented count . . . .'  If the patentees had wanted to write this claim, they could have, but did not.  *Merck*, 395 F.3d at 1372; *Power Mosfet*, 378 F.3d at 1410; *Qcue*, 2013 WL 4784120, at *4.

Second, WSOU cannot avoid the inherently subjective term "primary" by pointing to the equally subjective term "frequent" or "frequently."  WSOU points to "frequent" in both the claims (*see supra*) and the specification, specifically:  "cumulative distribution of most frequent stationary states for a mobile terminal accumulated incrementally over time."  (Dkt. 33 at 12 (quoting Ex. 13 at 3:33-37)).  But the patent does not define the boundaries of "frequently" any more than it does "primary," leaving unanswered how "frequently" is frequent enough to be "primary," and creating "[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims" in violation of § 112.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-10 (2014) ("And absent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims.").  A person could accurately state that she frequently visits the dentist and frequently washes her dishes, even though one of those likely occurs far more often than the other.  A different person could accurately state that she frequently visits the dentist and frequently visits her mother, and the listener would have no idea which occurs more often because the concept of a 'frequent visit' is inherently subjective and depends on factors including one's feelings about one's dentist and one's mother.

WSOU points to Figures 11A and 11B, and Tables 6 and 7, as shedding light on the meaning of "frequency."  (Dkt. 33 at 12 (citing Ex. 13 at 3:33-37, 23:15-54; 24:10-18).)  They do the opposite:  Figures 11A and 11B show the distribution of "top" stationary states, described in the specification as the "most frequent stationary states for a mobile terminal accumulated incrementally over time."  (*Id.* at 23:24-26.)  Figures 11A and B thus show stationary states that

16

have *already been determined* to be the "top" or "most frequent" from among some greater set, but do nothing to explain how to make that determination, and thus cannot help elucidate "determin[e/ing] a primary set of stationary states." WSOU notes that these figures track only the "first through sixth most frequent stationary states" (Dkt. 33 at 12), again begging the question of how to "determine" the "primary set" ends at number six. Likewise, Tables 6 and 7 show that some "stationary states" occur more frequently than others, but do not show how to separate "a primary set" from the full set of "stationary states," and do not even purport to do so. (Ex. 13 at 23:15-22, 24:10-19.) Instead, these tables skip the "determining" step and assume that the "primary set" is the "stationary states that cover 95% of the stationary time of a user." (*Id.* at 23:64-65.) But neither the patent nor WSOU in its brief explains how it arrived at the 95% cutoff, whether the 95% cutoff separates the "primary set of stationary states" from the others, or how a person of skill in the art could find the line without asking WSOU. (Ex. 13 at 23:12 to 24:46; Dkt. 33 at 12.) Finally, WSOU claims that "determining a primary set of stationary states includes stationary states with the most observations, or highest (most frequently) incremented counters," (Dkt. 33 at 12), but again this only begs the question: how many are among "the most?" The patent does not say, and WSOU does not know.

The term "determin[e/ing] a primary set of stationary states" is indefinite because "primary set" is inherently subjective, and WSOU's attempts to define it rely on new terms that are equally subjective, an example of "turtles all the way down." *Rapanos v. United States*, 547 U.S. 715, 754 (2006) (Opinion of Scalia, J.). The patent provides no objective criteria to determine what is "primary" and thus "[a]ny system designed by a competitor necessarily faces some litigation risk." *Qcue*, 2013 WL 4784120, at *9. "This may be a fine system for patent-

litigation plaintiffs, but it is no system at all for the public." *Id*.  The Court should find this term indefinite.

## IV.    U.S. PATENT NO. 8,751,585 (CASE NO. 6:20-CV-00577-ADA)

The '585 patent is directed to a specific method of managing electronic messages in an inbox by assigning a rule to selected messages that moves them to an archive location after a particular action is detected.  (Ex. 16 at Abstract.)

A.    **"moving the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," "to move the selected electronic message from the inbox to the archive location after detection of the action defined in the archiving rule," and "moving the first electronic message from the inbox of the electronic mail client associated with the user to the first storage location associated with the first archiving rule after the first action specified in the first archiving rule is detected" (claims 1, 9, 17)**

| Google's Proposed Construction[3] | WSOU's Proposed Construction |
|---|---|
| "moving the selected electronic message from the inbox to a different location in memory corresponding to the previously defined archive location after the communication system detects the action defined in the archiving rule" / "to move the selected electronic message from the inbox to a different location in memory corresponding to the previously defined archive location after the communication system detects the action defined in the archiving rule" / "moving the first selected electronic message from the inbox to a different location in memory corresponding to the previously defined first storage location after the communication system detects the action specified in the first archiving rule" | plain and ordinary meaning |

[3] WSOU takes issue with Google's proposed construction as applied across these claims given minor differences in their respective wording.  (Dkt. 33 at 17.)  For example, in claim 9 the term is "to move" as opposed to "moving," and in claim 17 the term is "specified" as opposed to "defined."  None of these differences are material to Google's construction, and for avoidance of doubt, Google has clarified that the language of the respective claims should be used by including the variants here.

Google's proposed construction clarifies two issues: (1) the requirement that it is the communication system that "detects" the action; and (2) the antecedent basis for the terms "the archive location" (claims 1, 9) and "the first storage location" (claim 17).  WSOU does not appear to dispute the first issue—nor could it.  The claims expressly require that the actions "can be detected by the communication system" (Ex. 16 at 8:21-22, 9:51-52, 11:21-22), and the specification is replete with references to "detection by the said communication system" (Ex. 16 at Abstract, 2:27-36, 4:35-37.)

Regarding the second issue, Google's construction is not a rewrite as WSOU contends. (Dkt. 33 at 17.)  Both the claim language and the specification support Google's construction, and WSOU's arguments otherwise demonstrate the need to define the proper scope.  First, the claims require movement of a selected electronic message from the inbox to a particular location—"the archive location" or "the first storage location." (Ex. 16 at 8:28-29, 9:63-64, 11:31-33.)  A plain reading establishes that "the archive location" in claims 1 and 9 refers back to "an archive location within the communication system" defined in conjunction with the archiving rule.  (Ex. 16 at 8:25-27, 9:44-57.)  Similarly, "the first storage location" refers back to "a first storage location within the communication system" specified in conjunction with the first archiving rule.  (Ex. 16 at 11:18-27.)  A POSITA would understand the patent's discussion of the movement of messages to "archive" and "storage" locations within the communication system to refer to locations in memory.  (Ex. 16 at 7:37-42.)  As such, WSOU's assertion that that the absence of the exact term "memory" from the '585 patent is "independently fatal to Google's construction" demonstrates that WSOU is not applying the plain and ordinary meaning of these terms and that the parties need a construction.  (Dkt. 33 at 17.)  Second, the specification confirms that the claimed movement of the selected message is from the inbox to a *different*

19

location in memory within the communication system—the location previously defined as the "archive location" or "first storage location."  (Ex. 16 at 2:30-37, 2:44-54, 7:35-54.)

### B.      "a list of actions" and "a plurality of actions" (claims 1, 9, 17)

| Google's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| a finite number of selectable items every one corresponding to an executable function | plain and ordinary meaning |

Google's proposed construction clarifies that the list or plurality of actions required by the '585 patent is composed of selectable items that correspond to executable functions.  This reflects the plain meaning of these terms based on the intrinsic evidence.  WSOU's arguments demonstrate that it is not applying plain and ordinary meaning, and construction is required.

First, WSOU erroneously claims that Google's construction excludes the possibility of a list of one action.  (Dkt. 33 at 14.)  One is a "finite number," and thus a list consisting of a single action falls within Google's construction.  Google has further clarified that "every one" of the selectable items corresponds to an executable function to further address WSOU's concern.  Moreover, the crux of Google's construction is not how many actions are on the list, but rather that the list is *finite*.  And this necessarily follows from the claims' requirement that an action *be selected from* a list—the user's choice is not unlimited and the universe of actions to choose from must be defined.  (Ex. 16 at 8:19-21, 9:49-51, 11:19-21.)  WSOU does not appear to contest this point, agreeing that "the 'list of actions' is further limited in terms of 'an action' that must be selected from the list."  (Dkt. 33 at 13.)  To the extent WSOU argues that the doctrine of claim differentiation requires the terms "a list of actions" and "a plurality of actions" to be construed

differently, Google is willing to clarify that a "plurality" refers to a finite number greater than or equal to two.[4]

Second, WSOU acknowledges that in claims 1 and 9, "an *action is selected from a list of actions that can be detected by the communication system*." (Dkt. 33 at 13.)  Similarly, in claim 17, "a first *action* is *selected from* a plurality of actions *that can be detected by the communication system*." (Ex. 16 at 11:19-21.)  It is common sense that if an action is to be selected from a list of actions, the actions that make up that list must by definition be "selectable."  The specification confirms as much.  (Ex. 16 at 4:15-23.)  Moreover, the actions on the list cannot be just any actions—they must be executable functions that can be detected by the communication system.  The claims require that the actions "can be subsequently carried out using at least some portion of the communication system." (Ex. 16 at 8:17-19, 9:47-49, 11:28-30.)  The inventors also describe numerous "actions" that a user could select for the archiving rule, all of which are functions executed using parts of the communication system.  (Ex. 16 at 4:39-53, 4:54-5:24.)  WSOU's argument that Google adds "extraneous requirement[s]" ignores this intrinsic evidence and leads to nonsensical results.  (Dkt. 33 at 14-15.)  For example, according to WSOU, because "only 'the action defined by the archiving rule' need be 'selected from a list of actions,'" there is no requirement that each action in the list be "selectable." (Dkt. 33 at 14-15.)  Under WSOU's interpretation, the list or plurality of actions could include actions that were not selectable by a user.  That does not make sense in the context of the '585 patent.

---

[4] The terms "list of actions" and "plurality of actions" appear in independent claims.  The Federal Circuit instructs that courts must "be[] cautious in assessing the force of claim differentiation in particular settings, recognizing that patentees often use different language to capture the same invention, discounting it where it is invoked based on independent claims rather than the relation of an independent and dependent claim."  *Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 607 (Fed. Cir. 2015).

    **C.**    **"client management processor configured to enable the user to select an electronic message from the inbox" (claim 9)**

    **D.**    **"a detection processor configured to detect the action defined in the archiving rule assigned to the selected electronic message was carried out" (claim 9)**

    **E.**    **"a collaborative application management processor configured to manage collaborative applications" (claim 9)**

| Google's Proposed Construction | WSOU's Construction |
|---|---|
| Section 112, ¶ 6 applies.<br><br>Function: to enable the user to select an electronic message from the inbox<br><br>Structure: indefinite | For all three "... processor configured to ..." terms of claim 9: plain and ordinary meaning; not subject to means-plus-function treatment; and definite. |
| Section 112, ¶ 6 applies.<br><br>Function: to detect the action defined in the archiving rule assigned to the selected electronic message was carried out<br><br>Structure: indefinite | |
| Section 112, ¶ 6 applies.<br><br>Function: to manage collaborative applications<br><br>Structure: indefinite | |

For these terms, the issues are: (1) whether the phrase "processor configured to" invokes Section 112, ¶ 6, and (2) are these terms indefinite for failure to disclose corresponding structure for their respective functions.  WSOU wholly fails to address the second issue, forfeiting any argument regarding alleged structure for these terms.

For the first issue, the essential inquiry is "whether the words of the claim are understood by [POSITAs] to have a sufficiently definite meaning as the name for structure."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  Though absence of the word "means" creates a rebuttable presumption that a term is not a means-plus-function limitation, Section 112,

¶ 6 applies when the claim term: (i) "fails to recite sufficiently definite structure," or (ii) "recites function without reciting sufficient structure for performing that function." *Id.* at 1349.

As a threshold matter, WSOU's primary argument rests on the erroneous premise that there is a categorical rule that the term "processor" avoids means-plus-function treatment. This Court and other districts make clear that whether the term "processor" invokes Section 112, ¶ 6 requires a case-specific analysis. *See, e.g., Dyfan, LLC v. Target Corp.*, 6:19-cv-179-ADA, Dkt. 57 at 20 & n.4 (W.D. Tex. 2020); *St. Isidore Research, LLC v. Comerica Inc.*, 2016 WL 4988246, at *14 (E.D. Tex. 2016) (construing term "processor configured to" as a means-plus-function limitation because the processor "is defined only by the function that it performs"). As this Court instructs, applicants cannot "simply recite two nonce words—'processor' and 'code'—together in order to essentially write the claim in a means-plus-function format without being subject to § 112, ¶ 6." *Dyfan*, Dkt. 57 at 20 n.4.

The intrinsic record establishes that the phrase "processor configured to" in claim 9 does not provide sufficient structure for performing the claimed functions. <u>First</u>, claim 9 is drafted in the same format as traditional means-plus-function claims with the phrase "processor configured to" simply substituted for the phrase "means for." The claim language following the "processor configured to" phrase is purely functional without reciting any structure. *See Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.,* 2015 WL 4937464, at *9 (W.D. Tex. 2015) (construing "processing device" as a means-plus-function term because the claim "employs purely functional claiming without reciting sufficient structure in the claims to perform the function described"). In short, claim 9 tells you what the "processor" does—*i.e.*, it "*enable*[s] the user to select an electronic message," it "*detect[s]* the action defined in the archiving rule," and it "*manage*[s] collaborative applications"—not what it is. Accordingly, the "processor

23

configured to" phrase "does not provide any indication of structure because it sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used." *Williamson*, 792 F.3d at 1350.

Second, contrary to WSOU's assertion, the adjectival modifiers preceding the term "processor" in these terms are not "structural descriptions." (Dkt. 33 at 20.) They also merely describe the processor's intended function—*i.e.*, "client management," "detection," and "collaborative application management." WSOU fails to argue that any of those modifiers has a generally understood structural meaning in the art, or explain how they provide structural significance. *Williamson*, 792 F.3d at 1351; *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1373 (Fed. Cir. 2015); *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1096–97, (Fed. Cir. 2008); *Rain Computing, Inc. v. Samsung Elecs. Co.*, 2020 WL 708125, at *4 (D. Mass. Feb. 12, 2020). They do not.

Third, while claim 9 uses the term "processor," the specification uses either "means" or a well-known nonce word such as "agent" when discussing performance of the same functions. For example, the specification describes a "collaborative application management means," as opposed to a "collaborative application management processor." (Ex. 16 at 3:21-22, 5:8-10.) Additionally, it does not describe a "detection processor," but rather a "means of detection to detect that the action attached to the said message has been carried out" (Ex. 16 at 2:50-51), and further describes that "[d]etection of the performance of an action is rendered possible using different *agents*" (Ex. 16 at 6: 1-2). These "agents" are depicted simply as black boxes in Figure 1 (Ex. 16 (114a-d)), and the specification provides no disclosure of how any of them perform the specialized function of detecting the various actions that take place throughout the communication system. *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1373 (Fed. Cir. 2020).

Similarly, Claim 9 requires an "electronic message client comprising a client management processor configured to enable the user" to take certain actions (Ex. 16 at 9:43-44), but the specification provides that the "electronic message client comprises *means* to enable the user" to take those actions (Ex. 16 at 2:41-42).  Such interchangeable treatment of "processor" and "means" demonstrates that the patent uses the term "as synonyms."  *MIT v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006).  WSOU's own cited cases confirm this point.  *See Cypress Lake Software, Inc. v. Samsung Elecs. Am. Inc.*, 382 F. Supp.3d 586, 615-16 (E.D. Tex. 2019) ("By using this parallel language, [POSITAs] would understand that the [patent] uses the terms 'code for' and 'means for' as synonyms.  Accordingly, Defendants have rebutted the presumption that § 112, ¶ 6 does not apply to the disputed 'code for' terms.").

Given that the "processor configured to" phrase as used in each of these terms invokes Section 112, ¶ 6, they are indefinite because the '585 patent fails to provide structure for performing any of the claimed functions.  Instead, the specification simply repeats each claimed function, but it does not provide any algorithm or other structure for carrying out that specific function.  (Ex. 16 at 2:37-54; 5:54-62; 5:66-6:43, Fig. 1.)  "This type of purely functional language, which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012).  Tellingly, WSOU cannot identify any structure for performing any of the claimed functions.

Date: February 12, 2021

Respectfully submitted,

*/s/   Tharan Gregory Lanier*
Tharan Gregory Lanier (*pro hac vice*)
**Jones Day**
1755 Embarcadero Road
Palo Alto, California, 94303
+1 (650) 739-3939
+1 (650) 739-3900 facsimile
tglanier@jonesday.com

Michael E. Jones (Texas Bar No. 10929400)
Patrick C. Clutter (Texas Bar No. 24036374)
**Potter Minton, P.C.**
110 North College, Suite 500
Tyler, Texas, 75702
+1 (903) 597-8311
+1 (903) 593-0846 facsimile
mikejones@potterminton.com
patrickclutter@potterminton.com

Matthew S. Warren (California Bar No. 230565)
Jennifer A. Kash (California Bar No. 203679) (*pro hac vice*)
Erika Warren (California Bar No. 295570)
Warren Lex LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
20-585@cases.warrenlex.com

Sasha Mayergoyz
**Jones Day**
77 W. Wacker Drive
Chicago, IL 60601
+1 (312) 782-3939
smayergoyz@jonesday.com

Tracy A. Stitt
**Jones Day**
51 Louisiana Avenue NW
Washington, DC 20001
+1 (202) 879-3641
tastitt@jonesday.com

Michael A. Lavine
**Jones Day**
555 California Street
26th Floor
San Francisco, California 94104
+1 (415) 626-3939
mlavine@jonesday.com

David E. Anderson
**Jones Day**
325 John H. McConnell Blvd, Suite 600
Columbus, OH 43215
+1 (614) 281-3617
danderson@jonesday.com

*Attorneys for Defendant Google LLC*

## **CERTIFICATE OF SERVICE**

I certify that on February 12, 2021, I served the foregoing by electronic mail on counsel of record.

/s/ *David E. Anderson*
David E. Anderson